RHEUBEN F. GREEN ET UX v. MID-STATE HOMES, INC.

5-4763                                                435 S.W. 2d 436

Opinion Delivered December 23, 1968
[Rehearing denied January 27, 1969.]

*Lightle & Teddler* for appellants.

*Spencer & Spencer* for appellee.

GEORGE ROSE SMITH, Justice.   The issue here is that of usury in a contract for the construction of a

shell home.    The chancellor upheld the contract and ordered a foreclosure of Mid-State's mortgage.

The material facts are not similar to those in any of the many usury cases that we have considered in the past fifteen years or so.    Here Mid-State's assignor, Jim Walter Corporation, agreed on April 7, 1966, to build a house for the Greens for a contract price of $6,-355, with the transaction being financed by the builder. The Greens agreed to pay the taxes and insurance premiums; so the only elements involved were principal and interest.    According to the note and mortgage, the debt was payable in 144 monthly installments of $75.80 each, beginning June 15, 1966, and totaling $10,915.20.    It is undisputed that the installment payments could have been at least $75.95 each without exceeding the maximum interest rate of 10% per annum.    See Lake's Monthly Installment and Interest Tables, p. 152 (5th ed., 1959).

Green had retired from the military service shortly before the contract was negotiated and had not yet found civilian employment. Having saved some money, he wanted to make ten monthly payments in advance, to give him time to find a job.    The Walter Corporation salesman, Carl Allen, did not have a form of contract that could be used to put such a prepayment arrangement into effect.    Allen suggested that the money be used as a down payment, but Green rejected that suggestion—presumably because he would still have been required to begin making payments sooner than he wanted to.

The note and mortgage were actually executed for the full amount of the contract price; that is, as we have said, for $10,915.20 payable in 144 installments of $75.80 each, beginning June 15, 1966.    By oral agreement, however, Green obtained the desired ten-month moratorium by agreeing to pay the full amount of the first ten payments ($758) in advance— $500 on the day the

contract was signed and $258 five days later. Pursuant to that oral understanding Green was not required to make any monthly payment until April 15, 1967, ten months after the first payment was ostensibly due on June 15, 1966. Upon the debtors' default Mid-State, to whom the note and mortgage were assigned on June 17, 1966, brought this foreclosure suit on November 2, 1967. The defendants pleaded usury.

The contentions of the parties are clear-cut. The Greens insist that they were overcharged, because even though they paid $758 in cash at the inception of the contract, that amount was nonetheless included in the principal indebtedness, upon which interest was exacted at substantially the maximum rate for the full term of twelve years. Hence, say the Greens, the lender was charging interest as if the $758 cash payment had actually been advanced to the borrowers, although in reality the lender had the money from the outset in its own possession and available for its own benefit.

Mid-State counters by insisting that the Greens merely made a voluntary prepayment upon their indebtedness. They rely upon the rule that if an installment contract would not be usurious if paid according to its terms, the transaction is not rendered usurious by the debtor's voluntary payment in full before maturity, although as a result the creditor receives a sum amounting to more than the principal plus the maximum legal rate of interest. *Eldred* v. *Hart,* 87 Ark. 534, 113 S.W. 213 (1908).

We do not wholly agree with either side—at least not to the full extent to which they would carry their contentions. We consider first the Greens' argument. At the trial they introduced the testimony of a banker, Wayne Hartsfield. He testified that if the prepayment of $758 had been credited at once upon the principal debt, the balance of $5,597 could have been made payable in 144 monthly payments of $66.89 each. Under

that schedule the Greens' total payments would have been $1,283.04 less than the face amount of the actual note. By deducting from that difference the amount of the $758 initial payment, Hartsfield concluded that the Greens had been charged $525.04 in excessive interest.

Hartsfield's computations manifestly do not jibe with the undisputed facts. No party to the contract ever intended, as Hartsfield's theory assumes, that the Greens would begin making monthly payments within thirty days. To the contrary, everyone agrees that the Greens' prepayment was for the specific purpose of affording them a respite of ten months, at the end of which they would be in exactly the same position as if the ten payments had been made when due. Thus Hartsfield's testimony presupposes a hypothetical situation so different from the actual facts that we have found his calculations to be of no assistance to us.

Nor can we go all the way with Mid-State's insistance that the doctrine of *Eldred* v. *Hart* is controlling. That case had to do with a loan that was *not* usurious in the beginning. Of course a debtor cannot, by making a payment in advance of its due date, convert a valid loan into a usurious one. If that were the law no one lending money at the maximum legal rate of ten per cent per annum could afford to accept an installment payment even a few days before it was due.

On the other hand, the lender cannot be allowed to hold back part of the loan under the guise of an acceptance of voluntary prepayments by the borrower. We cannot lay down a rule that would open the door to the exaction of outwardly "voluntary" prepayment agreements from borrowers actually acting under the pressure of financial necessity.

In the study of the case we have explored a number of tentative theoretical and mathematical approaches

to the problem, with a variety of results. We are now firmly convinced that no solution should be adopted that does not take into account two of the undisputed realities in the case:

First, the parties unquestionably intended for the Greens, at the expiration of ten months, to occupy precisely the same position they would have occupied if the payments had been made every month instead of all at once. That is, at the end of the ten months the Greens would have paid all the interest accruing up to that time and also would have made ten part payments upon the principal debt. No solution that fails to recognize those facts is acceptable.

Secondly, the problem cannot be solved by likening it too woodenly to a simple loan of money, with the lender withholding part of the principal. It must be remembered that the Greens, as of the date of the initial agreement, became entitled to a $6,355 house, for which they could lawfully have paid cash in advance. We are dealing with a sale on credit rather than a loan of money only. That points up a flaw in Hartsfield's assumption that the $758 prepayment had to be deducted from the principal debt of $6,355. Such a theory might be acceptable with respect to a lender holding back part of the principal, but it does not apply with equal force to the seller of a house who delivers in a credit transaction the property agreed upon.

We have concluded that the transaction was not usurious. The simplest approach seems to us to be the best: All that really happened was that the Greens prepaid ten installments, comprising both interest and principal, that might have been paid over as many months. What did the Greens lose, or, conversely, what did Mid-State gain, by the prepayment?

At most the Greens lost the use of their money for ten months. Mid-State gained a corresponding advantage. Ten per cent interest upon the prepayment

of $758 amounts to only $63.16.    Lake, pp. 299 and 347.
In fact, the Greens lost only a little more than half of
the $63.16; for, by having agreed to pay the install-
ments monthly rather than in a lump sum at the end of
the ten months, they were never entitled to retain the
entire $758 for the full ten months.    Their actual loss
appears to have been about $34.75.

The addition of $34.75 to the interest agreed upon
would not put the total over the ten per cent limit, for
the contract as written called for interest charges at
least $90.45 below the legal maximum.    We have al-
ready pointed out that the 144 monthly installments
might have been increased by 15 cents each, or $21.60 in
all.    Also, the first monthly payment might have been
made payable on May 7 instead of on June 15.    That
waiver of interest for 39 days provides an added leeway
of $68.85.    Hence the contract was valid.    The fact
that it was in writing answers the appellants' subord-
inate contention that the maximum of six per cent, ap-
plicable only to oral contracts, should be applied.    Ark.
Const., Art. 19, § 13; Ark. Stat. Ann. § 68-602 (Repl.
1957).

Affirmed.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice.    The majority has
found a new test for usury, heretofore unknown to Ar-
kansas law.    As I understand this novel approach, it
simply compares the arrangement made to the face of
the note and mortgage by figuring the discount rate on
the payments by appellants in lieu of the first ten pay-
ments.    This is not, and never has been, the test for
usury.    Nor is there any real difference in a credit sale
and a loan of money under the circumstances here.
*Sloan* v. *Sears, Roebuck & Co.*, 228 Ark. 464, 308 S.W. 2d
802.    Although the note dated April 7, 1966 provided
for payment of a $6,355.00 debt by paying 144 monthly
installments of $75.80 each, beginning June 15, 1966,

and totalling $10,915.20, the actual arrangement was somewhat different. Appellant paid $500.00 on the date of the note and $258.00 on April 12, 1966. According to the agreement, the monthly payments began May 15, 1967. The actual arrangement was the same as if appellants had paid $500.00 as a down payment on the date of the transaction and agreed to pay $258.00 on April 12, and 134 payments of $75.80 beginning May 15, 1967. In testing for usury, the amount to be considered as principal is the net amount of which the borrower or purchaser had the benefit for the full term. *Smith* v. *Eason*, 223 Ark. 747, 268 S.W. 2d 389. In this instance this would be $6,355.00 less $500.00, or $5,855.00. The test for usury is whether the total amount to be paid by the borrower or purchaser in performance of the agreement is in excess of the principal received, plus 10% per annum for the term. *McDougall* v. *Hachmeister*, 184 Ark. 28, 41 S.W. 2d 1088.

Where there are partial payments, the method of testing for usury is clearly set out in *Lyttle* v. *Mathews Investment Co., Inc.*, 193 Ark. 849, 103 S.W. 2d 47, and followed in *Commercial Credit Plan, Inc.* v. *Chandler*, 218 Ark. 966, 239 S.W. 2d 1009. The proper method of calculation is to figure interest at the maximum rate on the principal up to the date of the first partial payment, add the interest to the principal, and deduct from the total the amount of the partial payment. Then, 10% interest for one month on the *principal* balance then remaining should be added, and from this total the next monthly payment should be deducted. This procedure should be followed until all 134 monthly installments have been taken into consideration. Of course, the monthly interest should always be figured on the principal balance and not on the accrued "interest." *Lyttle* v. *Mathews Investment Co., Inc., supra.* If any principal balance remains after the application of all payments on this test, the contract is not usurious. This is only a *test* to determine whether the purchaser is being required to pay more than the maximum he could

be required to pay. It does not mean that the payment of any interest would be required of the Greens during the ten months' period while payments were excused, as suggested by the majority. The Greens would not be required to pay any more or any less. Under the proper test for usury and the agreement between the parties, the Greens would have paid $70.00 in excess of the legal maximum. The note is usurious, and should be canceled.

It must be remembered that this is not a case in which the agreement calls for compound interest. Such an agreement has been held not usurious in certain circumstances, with indications that other such contracts might be usurious under other circumstances. *Phipps-Reynolds Co.* v. *McIlroy Bank & Trust Co.,* 197 Ark. 621, 124 S.W. 2d 222. Nor is it a case in which the borrower (purchaser) agreed to deposit moneys in an escrow account with a third party in advance of the due date of payments, which probably would not render the contract usurious. It must be remembered that the seller here had full use of the $500.00 payment from the date of the original transaction and of the $285.00 beginning five days later.

I would reverse the chancery court and cancel the note and mortgage.